Mr. Clerk, please call the case. Case number 11-0115, Peter Garvy v. Seyfarth Shaw Counsel, if you could both approach and let us know your names and who you represent. Good morning, Your Honor. It's Jeff Coleman for Seyfarth Shaw. Michael Flaherty, Your Honor, for the plaintiff, Peter Garvy. Okay, 15 minutes per side, and if you need time for rebuttal, please reserve some, and if we unduly pester you, we might give you a little extra time, but we might not. Very good, thank you. May it please Your Honors, good morning. I would like to reserve a few minutes for rebuttal, if that will be possible. Done. This matter is before the court on interlocutory appeal from a contempt finding for violating discovery orders of the circuit court. Essentially, the Seyfarth Shaw Law Firm has been held in contempt and fined $100, friendly contempt, for refusing to produce two categories of documents, both generated between November 3, 2004, and May 2, 2007, a two and a half year period. The two categories are, first, documents reflecting communications by lawyers within the Seyfarth firm and the firm's general counsel, internal communications with firm general counsel. And the second category, communications by Seyfarth lawyers with outside retained counsel. Circuit court judge ruled as to both categories that no attorney-client privilege existed for one reason, and only one reason, because Seyfarth continued to represent its client, Peter Garvey, during that period of time. So for that reason, and that reason only, the court said, you cannot have privileged communications unless you withdraw. The ISBA and the CBA have done an amicus brief with this court that explains in, I believe, a very persuasive manner why these documents are privileged, should be privileged, why the interests of not just lawyers but clients and the integrity of the judicial process warrant that these documents be privileged. Nothing in Illinois law warranted this decision. There are some cases around the country where this kind of issue has percolated. Essentially, the courts have looked to see, first, whether the communications were the traditional privileged type of confidential communications. And they were here. These were lawyers seeking advice about purported malpractice claims. Second, the courts then looked to see if there's any exception to the privilege. Some jurisdictions have adopted what they call the fiduciary duty exception to the attorney-client privilege. The Illinois appellate court in the second district in the Mueller case said that's not the law of Illinois. Other courts have adopted a conflict of interest exception, which gets you into questions of disclosure and waiver. And a third exception that has been referenced only in the appellate court in this case is the crime-fraud exception. That exception in the circuit court was explicitly not raised by Mr. Garvey. On November 3rd, counsel, Mr. Flaherty, said we don't have to go to crime-fraud. That's A116. On November 22nd, he said, and I quote, now we could have gone down the crime-fraud exception and be arguing fraudulent concealment. There was no need to, end of quote. That's A194. So that issue is not in this case, except they raise it in their appellate brief, and there is a motion that's taken with the case to strike portions of the appellate brief for raising matters that were not of record in the circuit court. As I think your honors know, there's no case law in Illinois that directly deals with this issue. There is no appellate court opinion. I find this a little surprising. I don't know if you do. There's no appellate court opinion in the country dealing with this issue. There are some federal district court opinions that the parties have discussed in our briefs, but most importantly, every single case, I believe, talks about how you need to look at this on a case-by-case fact basis. And the important thing here, your honors, that I'd like to take a couple of minutes to discuss, is the sworn, uncontested record in this case. Sworn to in the affidavit of Mr. Woodford, the general counsel of SafeHearth. It's in the appendix at pages 244 to 248 with some attachments. Here are the facts, and I respectfully submit that while some of the general legal principles that you're going to be addressing in your opinion are really important to lawyers throughout our community, without meaning to be presumptuous, I think the easiest way to actually decide this case is by looking at the sworn, uncontradicted record. So here it is. In August of 2004, after years of bitter fighting among Mr. Garvey and his siblings, his siblings sue him in a chance reaction in the Circuit Court of Cook County. August of 04. The complaint, which is of record, clearly calls into question business advice that the SafeHearth law firm had provided to Mr. Garvey and his father. So Mr. Garvey and his father ask the SafeHearth firm, will you represent us in this case brought by the siblings? And the lawyers at SafeHearth talk to Mr. Garvey, and then on November 3, 2004, send him a very detailed letter setting forth the conflict of interest issues that he needs to consider. That letter is at pages 249 to 254 of the appendix. It's a very detailed letter. It says, among other things, and I quote, it's almost impossible to determine all of the conflicts which may arise from this set of facts. There is at least the potential that SafeHearth Shaw could be seen as taking positions to favor its own interests over the interests of both of you. And then it says, and I quote, because plaintiffs have made so many allegations relating to the role of SafeHearth Shaw in this matter, we strongly, and the word strongly is underlined in the letter, we strongly encourage you to seek independent counsel regarding the import of this consent and your rights in this matter. It concluded by saying, if this is okay with you, sign this letter and send it back to us. We do not have a record of Mr. Garvey signing the letter. Instead, one week later, sworn facts in this case, uncontradicted, one week later, Mr. Garvey hires the Schiff Hardin Law Firm as independent counsel to talk with SafeHearth about the November 3 letter. Schiff Hardin, within a month, threatens claims of malpractice, but asks on behalf of Mr. Garvey that the SafeHearth firm continue to represent Mr. Garvey in the sibling litigation. That strikes me as being a little bit unusual. It is unusual. It is even more unusual, Your Honor, that the Schiff Hardin lawyers for the next year and a half, they ask for a tolling agreement and they get it. And they, at some points, demand that SafeHearth continue to represent Mr. Garvey. When does he stop paying them? He stopped paying in early 05. So the SafeHearth firm, this is not a record, but I can represent as an officer of the court, that Mr. Garvey, well, it is a record, because in the counterclaim that SafeHearth filed in the pending litigation, SafeHearth is seeking $1.2 million for unpaid fees, starting, I believe, in the beginning of 05 and going through the end of the litigation with true May 2nd. And since we're on this, why don't you tell us why this amounts to a staple or should amount to a staple in Mr. Garvey's case? Because, Your Honors, with independent counsel blessing what was occurring, Mr. Garvey was requesting, demanding, insisting that the firm continue to represent him. And now, indeed, on May 2, 2007, when SafeHearth moved to withdraw in the chance reaction, Mr. Garvey, with his new counsel, comes into court and objects to that, objects to it. Didn't he go so far as to say it would act as his detriment? Yes, he did. And, indeed, Your Honors, so you understand, and I believe you can properly take judicial notice of the records from the chance reaction from May of 2004 until, I'm sorry, November of 2004 until May of 2007, very little occurred in that litigation. Number one, the SafeHearth lawyers were successful at getting the judge to dismiss various iterations of the complaint, including those portions that called into question SafeHearth's conduct. One. Two, there was very limited discovery. Three, SafeHearth filed a counterclaim for Mr. Garvey against his siblings, and that brought the litigation to a screeching halt, to a stay, to pursue settlement discussions. And in response to Your Honor's question, SafeHearth was talking about withdrawing from the summer of 2006 on. And the settlement discussion started, and the Schiff-Hardin lawyers, on behalf of Mr. Garvey, said, please don't withdraw. That could disrupt the settlement discussions. And so what happened was SafeHearth agreed to continue to represent Mr. Garvey until the settlement discussions had either succeeded or failed. When they failed in April of 2007, SafeHearth moved to withdraw, all over objection. The circuit court's dealing with all these facts was to say two things. Well, I've looked at the November 3, 2004 letter, and it's possible, it's possible that there was something more. That's true. It's always possible. I may be forgetting to say something to you this morning that I should say. It's possible that there's more. And second, the judge chastised my wonderful colleague, Mr. Storino, and said, well, if I were to really rely on this type of letter, it would be like asking the students to grade their papers. The reality here is that these types of letters under Rule 1.7 are written every day to deal with multiple representation issues and all other kinds of potential conflict situations. Every single day. And the reality here is that we always rely on the good faith of the lawyers to write a decent letter. How could a disclosure letter ever be issued that wasn't like a student grading a paper? You're absolutely right. And indeed, Rule 1.0 of our Rules of Professional Conduct talk about what informed consent is. It involves communicating adequate information and explanation about material risks, which was done here. And the comment six to the rule says, and I quote, generally a client who is independently represented by other counsel in giving the consent should be assumed to have given informed consent. So in a way, Your Honor, again, it's my wonderful colleague, Mr. Storino. He may be chastised. No, he's the one who reminded me, in a way here, while Safarth wrote the letter on November 3, the grading came from Schiff Hardin, which reviewed the letter, communicated with Safarth Shaw lawyers about the letter, blessed the relationship going forward. There is no case that I am aware of in this country where this type of informed consent was disregarded by the courts and where privilege was held not to apply, number one. Number two, there also, to my knowledge, are no cases anywhere in this country where a court other than the circuit court here has said lawyers cannot go and retain outside counsel to deal with these situations. So with all due respect, we ask that you reverse the contempt order, reverse the discovery orders. The only rationale that some of the courts get into in terms of conflict of interest where they're talking about in-house counsel, the conflict analysis is, well, maybe the in-house general counsel should be viewed as part of the firm with duties to the client. Understood. That's not the law in many jurisdictions, but here the waiver deals with that, number one. And number two, those courts that talk about this imputed conflict for lawyers within the firm say, well, but you can always go outside. And a lot of the courts say, but we don't want to make lawyers go pay for other lawyers outside their firm in order to accomplish that. So for all of those reasons, we respectfully ask that you reverse. I'm sorry. You've identified that there were two different kinds of documents in this friendly contempt. Those reflecting safe birth to safe birth people and those reflecting safe birth to outside counsel. But isn't the timing of those documents also an issue? Like at what point they were still representing Mr. Garvey and at what point they were not still representing Garvey? Thank you for asking that. The timing is all in the same time period from November 3. I remember the date because it's my birthday. I always ask you, well, how do you remember that date? From November 3, 2004 until May 2 of 2007 is the time period for all of these documents. And you should know we produced every single piece of paper pre-November 3, 2004. We produced almost 200,000 pages of documents to Mr. Garvey and his counsel, everything prior to November 3, 2004. And you should also know, as you would probably guess from the facts, there's no allegation, none, that anything done by the Safar firm after August of 2004 was improper, negligent, irregular, none. The communications from Schiff kept saying Mr. Garvey's satisfied with the representation. He wants you to continue the representation. He objected to them withdrawing. So unless your honors have additional questions, thanks very much. Thanks. Mr. Flaherty. Thank you, Your Honor. May it please the Court, Michael Flaherty on behalf of the plaintiff, Peter Garvey. Counsel, I'd like to start first with your word, Justice, as far as for delineating between the three different types of privilege logs that are involved here and the three different types of documents. The first privilege log that's involved here is Privilege Log A. Now, one thing I want to make sure that the Court is fully aware of, because I respectfully suggest the amici weren't aware of this, is that neither Garvey nor Judge Pierce is trying to do anything that prevents a lawyer from obtaining professional advice concerning that lawyer's professional obligations. Such advice is consistent with the lawyer's professional obligations to the lawyer's current client. The Thielen case that Judge Pierce relied on is a case that's consistent with that. What we're talking about, and so is the ABA opinion, by the way, that's cited in the materials. The reason that that policy exists is because both the client and the lawyer are benefiting when the lawyer understands what the lawyer's professional obligations are and acts in conformity with those obligations. And so in that setting, the only information that's required under Rule 1.4 to be disclosed is the conclusion. If you reach the point where the conclusion is that the lawyers have somehow breached some obligation to their client, nothing else is required to be disclosed concerning that. That's not what we're talking about here. And there was a war that went on at the trial court level concerning whether we could access privilege logs and whether we could delineate what the war was about. We accessed those logs. There were a total of six documents, six, that were generated by the Safe Arts Internal Council that dealt with Safe Arts' own internal discussions concerning fulfilling of its professional obligations. Judge Pierce asked if there were any conclusions because he wanted us consistent with 1.4 to have those conclusions. We were told there were no conclusions that were reached in that, and that's where that was left. What was compelled here is instead two different categories of documents. And what's important is it isn't just the documents that were Safe Arts documents or the documents that were Jenner's. It's only the documents that were known to Safe Arts while Safe Arts was Peter Garvey's fiduciary. So that if Safe Arts has internal documents or documents that it shared with the insurance company or anyone else that weren't known to Safe Arts during the attorney-client relationship with Garvey, we didn't seek those documents. Those documents weren't ordered. What was put on the privilege log are only the documents that were known to Safe Arts. Privilege log C is the, in large quotes, the Jenner documents, but they're only the ones that were known to Safe Arts. And privilege log B are the 144 documents that were generated by Safe Arts. Now, let's talk about those documents. Now, there's this issue about whether there's a conflict waiver letter. And so if there's a conflict waiver letter, can't the law firm just do it at once? The conflict waiver letter doesn't say, we quit being a fiduciary. The conflict waiver letter has no discussion at all concerning any limitations on the fiduciary obligations that Safe Arts owed to my client. It has no limitations on the loyalty obligations or their candor obligations. This court in Doe v. Roe recognized that lawyers sit in a fiduciary relationship regardless of what's said in the terms of the engagement. And in that setting, the duties of loyalty, confidentiality, candor, those are paramount. Those duties were the basis of Judge Pierce's ruling. And Judge Pierce's ruling wasn't really driven off of some fiduciary exception or some conflict. It was driven off of the fact that those communications could never have been privileged to Garvey. He did seem to rely on the fiduciary exception case law, though, which is a minority view. Would you agree with me on that? No. I think that what he relied on primarily is the case law that was generated in connection with Sunrise Securities and Thielen in those cases. And I don't think that those are driven by a fiduciary exception, per se. I think they're dealt with in terms of if there is an ongoing attorney-client relationship, then there is no privilege as to the client. There is no ability to do that. Are you urging us, though, to, you know, go down that road? Well, let me try to address it a different way. Let's first deal with it in terms of common representation. SafeHearth represented itself, and it represented Mr. Garvey. I think the law is already there. I think the law is there under Rule 1.7. I think the law has been there in Illinois since at least 1920. Then in a common representation, there is no privilege as between the parties that are part of that common representation. And here what we have is a situation to kind of put it in context. Let's say SafeHearth agrees to represent me and it agrees to represent Mr. Coleman. In that setting, anything that Mr. Coleman shares with SafeHearth or that I share with SafeHearth, SafeHearth's duty bound to disclose to everyone involved in that common representation. In that setting, the communications that I have with SafeHearth are never privileged as to Mr. Coleman, and his communications with SafeHearth are never privileged as to me. The privilege just doesn't apply. We're not talking about an exception in a common representation setting. And in that same situation, that's where we are here. SafeHearth had obligations to my client in that setting, and they never disclosed it. Now, one of the things I want to point out is Rule 1.7C that was in effect at the time of the representation, B and C, dealt with the conflicts including the lawyer's own self-interest, and said that when the representation of clients in a single matter is undertaken, the disclosure shall include explanation of the implications of common representation and the advantages and risks involved. During the entire time that Peter Garvey was represented by SafeHearth Shaw, SafeHearth Shaw never disclosed to Peter Garvey that it was engaging in communications that were adverse to him. It never disclosed to Peter Garvey that there were risks of that common representation because it was involved in representing its own interests over his. It never disclosed to him that they were perceiving that they had any sort of limitation on their duties of candor or loyalty to him. What they disclosed to him in that conflict waiver letter that Mr. Coleman discussed is some general information that effectively says there's these charges out here, our billing records say we did some work for you on these things, we don't really know where all this is going to go. So what we're going to try to do is discuss the conflict waivers we want now. First, we want to disclose that you and your father might have differing interests, so we want to deal with the waiver there. Secondly, we want to talk about ourselves. What does SafeHearth say about itself in that setting? It says we're first going to come out of the box and we're going to move to dismiss all these things. And if we dismiss all these things, then we may not have a conflict. If we don't dismiss all these things and it goes forward and we're added to the lawsuit, then at that point we may have a conflict and we may have to withdraw. That's all they said. Well, they said get a lawyer. Well, that's fine. But, Your Honor, in due respect, getting a lawyer is not saying that that means they're relieved of their obligations. They're both his lawyer then. And they didn't stop being his lawyer. So the fact that they're telling him get another lawyer to see whether or not you want us in the mix while we try to knock these cases out and while we try to settle them is fine. It is not saying, oh, by the way, while we're doing this, we're really going to be working adversely to you. We're going to engage in work product in preparation of litigation against you. We're going to hire a law firm to sit here and work with us against you. And we're going to be able not to tell you any of that while we're your lawyer. Now, I referenced the ABA opinion earlier. And the Thielen case is consistent with it. The documents that are in B and C don't fit into the same category as A. The B and C documents are documents that are generated for SEPAR's own personal interest. And there's no case that says that a fiduciary can undertake actions for its own personal interest and simply because it's for its own personal interest, they don't have to tell the people that they have a fiduciary obligation to. And that's what they're trying to do here. They're trying to have this court fashion some sort of relief that basically says, we've got to get out of jail free card, lawyers. You can go and give your client consent. You can go forward and try to mitigate a problem. And if you don't mitigate that problem, then you have to withdraw. So be it. But while that's going on, you get to do something else, too. You get to engage in conduct that you don't have to disclose to your client while they're your client. But what about their frustrated efforts to withdraw? They wanted to withdraw, and that effort and that desire was frustrated by your client. Your Honor, I think that the fact that they're threatening to withdraw in the context of when they're also trying to reach a settlement and they're representing our client in the settlement. I mean, they're threatening to sue them and they're not paying them. Wouldn't you want to get out? Your Honor, they had an easy choice there. All they had to do was move to withdraw. That wasn't what was going on. What was going on is that they were in a situation where there's a push-me-pull-you about how long we're going to stay in this because we're only going to stay in it until these motions are done and until we figure out if we can get it settled. And as time's going on and Garvey's not paying them, they're sitting there saying, this is getting a little out of hand, let's withdraw. But what about just the principle itself? What if they seek to withdraw and the trial court won't let them? If they seek to withdraw and the trial court won't let them, they don't cease being a fiduciary. That's where this all gets modeled. This conflict waiver letter never lets them off the hook of being a fiduciary. They act as if it does. It just lets them go forward in a conflicted representation. But in that conflicted representation, they still owe all their fiduciary obligations. And if they're in that setting and they're going forward and they can't do anything but be adverse to their client, they can't be adverse to their client until it's over. That's all it means. They have to still be a fiduciary. They can't pick and choose when to put the hat on and when to take the hat off, regardless of whether they want to get out of the case or they don't want to get out of the case. Now, in the context of wanting to get out of the case, that estoppel argument itself isn't really even anything that we've dealt with before. But to the extent it offends anyone, let me suggest something. The conflict waiver letter merely suggests that there's a mutuality in interest between Safarth and Garvey to knock out the allegations against Garvey. It doesn't suggest that there is adverseness that's going on at that same time between Garvey and Safarth, such that Safarth is engaging in conduct that's adverse to its current client. They can't do that. And as to the distinction between Safarth and Jenner, you know, I don't want to belabor the point, but I often work as outside general counsel to the law firms. And in that setting, if it's a current client relationship, I was constrained by my client's fiduciary obligations to its client as it is. I can't do anything that aids and abets my client's breach of fiduciary duty. If he can't do it directly, I can't do it for him. Now, there was a reference that we haven't gone down the road of crime fraud, and that's true. Let's put that a little bit in the setting. I had to fight just to get the privilege logs. We didn't get the privilege logs until Judge was already willing to compel production of all the documents. In that setting is the first time where we're seeing that Safarth and Jenner, for a period of years and some 800 documents, are basically engaging in attorney work product in anticipation of litigation against Peter Garvey while they're still his lawyer. Now, I think that's a breach of fiduciary duty. I think on its face it is. And I also think that in their reply brief, Safarth admitted that there was a breach of fiduciary duty. Because in that reply brief, it says that they're undertaking these actions not for Garvey's interest but for their own. Now, there was never a disclosure of that. I don't think it's allowed. I think it's a non-consentable conflict under Rule 1.7. But regardless of whether it's non-consentable or not, there was never any disclosure that Safarth was going to be engaging in conduct that was adverse to its current client while it represented it. There was never an agreement that Safarth was off the hook for its fiduciary obligations. And I think consistently- Do you have a case that you can cite us on the non-consentability, if that's a word? Your Honor, in the current comment to Rule RIPC 1.7, it says that it deals with non-consentability and also given Safarth's institutional interest in protecting itself. And actually, the current comments to Rule 1.7 talk about various situations where conflicts are non-consentable. But even with regard to that, if we were going to be talking about some consent here that could be consentable, there's nothing in here that would let any consent withstand scrutiny. Because the consent that went on here made no disclosures concerning the fact that Safarth, directly and through its counsel, was going to be engaging in conduct that was adverse to its current client. They can't do that. And that's consistent with the Thielen case. That's consistent with the logic of breaking out B and C. It's consistent with the ABA opinion. It's consistent with all the federal litigation. It's consistent with the law with respect to just general attorney-client privilege. Because how could anyone have an expectation that their communications internally at Safarth or externally with Jenner would be protected when at that very same time, would be protected from disclosure to Garvey, when at that very same time, Safarth had an unfettered, unqualified, complete obligation of candor to its client. An unfettered, an unqualified, a complete obligation of loyalty to its client. And if it couldn't act in accord with its fiduciary obligations, it had one choice, stand down. And if it wasn't willing to stand down, then it couldn't act in its own self-interest. And to try to dress this up any other way is to try to ask this court to excuse a breach of fiduciary duty. To try to dress it up any other way is to try to create a path where clients can be unwittingly victimized because lawyers who might have some responsibility, let's say we handled the transaction, now we're going to handle the litigation. We might have some responsibility, depending upon how that case turns out, we might be able to steer the case so that it helps us. We might have advice as to how to steer the case so it helps us. Do we not have to tell our client that? Why do we quit being lawyers simply because there's a tolling agreement? Why do we quit being lawyers simply because there's a waiver of conflict of interest and a common representation? The lawyer still has the same obligations of loyalty and candor to everyone involved in that common representation. Your Honor, if you have any other questions, I'd be glad to address them. All right. Are you suggesting that the letter, the November 3, 2004 letter, we'll call it the conflict letter, that but for information that the Safer Shaw people knew that wasn't in this letter, Mr. Garvey would have been better informed? No, Your Honor. I'm saying the letter doesn't suggest to Mr. Garvey at all that there is any adverse representation that's going on by his lawyers at SafeHeart respecting their own self-interest. And you know that because of the logs? The letters themselves doesn't say that, Your Honor. Now, we know from the logs that that's what they did because the logs, they're asserting attorney-client privilege and work product that they're refusing to produce. That's what I was trying to figure out. Yes. Where, the timeline again. I am sort of hung up on the timeline. This letter comes out November 3, and you're telling us that somewhere in these logs there is other information that was not included in this letter that should have been? No, Your Honor. What I'm saying is the existence of SafeHeart's efforts to engage in confidential communications adverse to its own client while it still represented that its client was never disclosed to Garvey. The fact that SafeHeart was engaging in work product in preparation of litigation against Garvey while it was still representing Garvey was never disclosed to Garvey. And the privilege logs demonstrate that that's what was occurring. Okay, so it was in the logs. That's how you know about it now. The reason we know about it now is because they have asserted privilege, asserting that there is an eternal privilege over these communications because it was within their own self-interest. Further, if the, bear with me one second, the, it's effectively also admitted by Jenner in the reply brief. Let me see if I can find it. Where it says the communications between SafeHeart lawyers and SafeHeart's general counsel. This is at page 20 of the reply. The communications between SafeHeart lawyers and SafeHeart's general counsel regarding Garvey's malpractice were adverse to Garvey. They say it right in their reply. Those are the communications that they are unwilling to share with Garvey then and they're still unwilling to share with Garvey now. I don't think this is a close call, Your Honor, to be very honest. I think what we're talking about here is a fiduciary has, in a common representation, has both Mr. Woodford having his obligations as also being Mr. Garvey's lawyer and the Garvey lawyers that are involved as being Garvey's lawyer having an obligation to disclose communications that are adverse to Garvey while they're Garvey's lawyer. They can't do anything else. So that's why the B and C are important because that's all B and C deal with. And just to kind of hone the point, this argument was framed, if you look at page one of the opening brief, it was framed that this is an important interest to lawyers in Illinois because what we're talking about is you're going to be catching lawyers in a catch-22. They're either going to have to withdraw the moment they need legal advice or they're not going to be able to get legal advice. Those aren't the options. They're allowed to get legal advice under Judge Pierce's ruling and under the authority that we've discussed. They're allowed to get legal advice to deal with compliance with their own professional obligations. They're encouraged to. That benefits the client. That benefits the law firm. There's nothing wrong with that. They're allowed also, if they want to get legal advice that's adverse to their client, to do one of two things, either be completely candid and disclose and if the client's going to sit there and keep you in the mix then, so be it, or to withdraw. They didn't choose those. What they chose instead was to get legal advice without being candid. Now, in a setting where you're dealing with in-house counsel or outside counsel and you're going to be dealing with things, let's say we have a problem we need to mitigate and we think we can mitigate it. First of all, that's consistent with both the interests of the firm and the client. But in doing that, you're going to be transparent as to what you're doing. The client's going to know. In fact, those were the documents that were produced to us were the documents dealing with where they were acting consistently. What was kept from us was the documents where they were acting inconsistent with their professional obligations. And we'd ask you to adhere to DoE, adhere to the teachings of DeLuna, adhere to the teachings of CRIPE. What we're talking about under Illinois law is that a fiduciary needs to be a fiduciary and there's no excuse not to be. Thank you. Counsel made some serious allegations that are not true and that the sworn, uncontradicted record in this case demonstrates are not true. He used words like secret and hiding. The sworn, uncontradicted facts of this case are that within a week of the November 3, 2004 letter, Mr. Garvey hired Schiff Hardin and Schiff Hardin, his lawyers, Mr. Garvey's lawyers communicated with first Peter Woodford, the general counsel, and then later with me. This idea that somehow in-house counsel or outside counsel were unknown to Mr. Garvey, were doing things that were somehow secretive, the firm in November of 2004 did not believe it had done anything wrong. It did not believe that. It sends a letter to Mr. Garvey, nonetheless, saying there is at least the potential that Safer Shaw could be seen as taking positions to favor its own interests over the interests of both of you, father and son. They say that directly to him. Then he gets his own lawyer. His own lawyer is communicating malpractice allegations to the firm. Is this court really seriously going to say that when allegations of malpractice are made against a lawyer, that lawyer cannot go and have a confidential communication with a partner, a colleague, an outside lawyer, to try to figure out if their claims are valid or not and to defend against them? Point number one. Point number two, this is not a common representation. This is not like representing two people in the same piece of litigation. It is an unusual situation, as your Honor had noted. But the dual representation here is representing Mr. Garvey in the chance reaction and then dealing with his lawyer's threats of malpractice. Very, very different. Safer Shaw embraces the duty of loyalty and candor and did fulfill those duties throughout this representation. There is not one allegation ever that the representation by the Safarth lawyers from November of 04 through May of 07 was anything other than exemplary. Not once. No allegation of wrongdoing. We ask in conclusion, again, I think the narrow way to deal with this is by looking at the informed consent here and independent counsel coming in. But for the reasons set forth in the Mikas brief and in the briefs of the parties, we ask your Honors to please render an opinion that makes it clear that lawyers, for themselves and for their clients, have the ability when threatened with malpractice claims to have confidential communications with lawyers to defend themselves. Interestingly, after saying no privilege applied here, the Circuit Court said, sort of in a backhanded way, but I'm going to make an exception. You can claim privilege for communications with your in-house lawyers about ethics advice. About ethics advice. That's part of Judge Pierce's order. And that's part of the Thielen-Reed type of thinking. Respectfully, the state of Illinois should do more than that to protect lawyers, clients, and the administration of justice and say, yes, you can have privileged communications to seek ethical advice and to defend yourself against malpractice claims. Here the 1.7 rule was complied with better than any I can ever imagine. It's also important for your Honors to acknowledge that there's no case anywhere in the country where outside counsel could not be sought for advice. And we ask that you reverse the contempt and the discovery orders. Thank you very much for all your time. Very well, we'll take it under advisement. Thank you for your excellent briefing and arguments in this important case. Thanks.